46631. HAMMOCK v. ALLSTATE INSURANCE COMPANY.

EVANS, Judge. Mrs. Dorothea M. Hammock, the plaintiff, had been under the care of a gynecologist for a number of years for amenorrhea (absence or suppression of menstrual period); and had developed menometrorrhagia from time to time. In 1957 an operation commonly known as a "D & C" was performed to stop the excessive uterine bleeding (menometrorrhagia), at which time the doctor noted that she was suffering from first degree cystocele (hernia of urinary bladder) and a slight rectrocele (hernia of the rectum), known as anatomical defects. He did not advise her of this condition. She was again operated on in 1962, when another "D & C" was performed. On or about November 30, 1966, Mrs. Hammock applied for a hospitalization policy with the defendant in which she listed the 1962 "D & C" operation. A policy was issued to the plaintiff excepting and excluding pregnancy, certain mental and nervous disorders and by special endorsement any thyroid disorder or disorder of the ears was specifically excluded (apparently since Mrs. Hammock had had a thyroid operation as well as the "D & C"). No exclu-

sion was made as to any female troubles. On February 2, 1967, after complaining of pain in the lower quadrant of her abdomen; pressure in her lower abdomen; stress incontinence of urine, irregular bleeding, and amenorrhea, a complete hysterectomy was performed to correct the diagnosis of cystocele, urethocele, rectocele and irregular uterine bleeding. As a result of this operation she incurred expenses for hospitalization and anesthesia and submitted proof of loss therefor to the insurance company which refused to pay same and advised her that, based on the medical reports and the provisions of the policy, they felt that the recent illness was not covered due to the following clause in the policy: "Sickness means sickness or disease that first manifests itself after the coverage under which claim is made has been in force 30 days for the family member whose sickness is the basis of the claim."

Thereafter, Mrs. Hammock filed suit against Allstate Insurance Company, the insurer, for the amount claimed and sought reasonable attorneys fees of $1,200 by reason of the refusal to pay in accordance with the terms of the policy which she alleged to be frivolous, unfounded and in bad faith. The defendant denied any liability under the policy and again, in its second defense, referred to the above clause, claiming that "such sickness for which claim is made first manifested itself prior to the expiration of such 30 day period." The case came on for trial and the sole issue for determination was whether or not the various female troubles from which the plaintiff was suffering could be said to be manifested before the insurance became effective. The medical expert who testified gave a history of his treatment of Mrs. Hammock for a number of years and that the decision to do the hysterectomy was the result of several factors, namely menometrorrhagia as well as her pelvic relaxation, and particularly the pain in her lower abdomen which was something that she had not told the doctor about previous thereto and as to which the doctor did not remember whether he had recommended an operation previously. The plaintiff testified that this was the first time the hysterectomy operation had been recommended. The medical expert also testified that the operation uncovered the fact that Mrs. Hammock had endo-

metriosis or ademyosis (in layman's terms from Dorland's Illustrated Medical Dictionary, 24th Edition—the uterine mucuous membrane occurring aberrantly in various locations in the pelvic cavity. Ademyosis—in the ovarian tissue as small superficial islands or in the form of endometrial cysts), which probably had a lot to do with her discomfort, excessive bleeding, pressure and pain toward the 20th of January, 1967; and that he was unaware of this until after the operation. The jury returned a verdict for the plaintiff in the amount of her claim, plus interest and $800 for attorneys fees.

The defendant filed a motion for judgment notwithstanding the verdict premised on its motion for directed verdict previously made before the jury returned its verdict. Defendant also filed a motion for new trial which was thereafter amended to add six special grounds. Thereafter the court granted the motion for judgment notwithstanding the verdict, thereby vacating and setting aside the jury verdict and dismissing and discharging the defendant with all costs cast upon the plaintiff, and, in conformity with § 50 of the CPA (*Code Ann.* § 81A-150 (c); Ga. L. 1966, pp. 609, 656; 1967, pp. 226, 237, 246, 248), conditionally granted the motion for new trial on the general grounds thereof should its judgment in favor of the defendant be thereafter vacated or reversed in accordance with this statute. The appeal is from the final judgment granting defendant's judgment notwithstanding the verdict or in the alternative from the grant of a new trial, with error enumerated as to each of the two rulings by the lower court. *Held:*

Plaintiff applied for the hospitalization policy about November 30, 1966, and as required by the policy, she truthfully disclosed her medical history for the five years immediately prior thereto. The policy did not contain any specific exclusion against female troubles, but did contain the following general exclusion: "Sickness means sickness or disease that first manifests itself after the coverage under which claim is made has been in force 30 days for the family member whose sickness is the basis of the claim."

Plaintiff was hospitalized in February, 1967, and an operation was performed. Defendant contends that her operation resulted from

female disorders which she had prior to issuance of the policy. It is important to note the meaning of the word "manifest" in arriving at a decision in this case. The insurer had the choice of using such words in the policy as it desired, and it chose the word "manifest." In *Lovett v. American Family Life Ins. Co.,* 107 Ga. App. 603 (131 SE2d 70) a somewhat similar situation was discussed where the insurer used the word "originate"; and in *Smith v. Inter-Ocean Ins. Co.,* 115 Ga. App. 584 (155 SE2d 665) another case is discussed in which the insurer used the word "contracted." Both are more exclusive terms than the word "manifest" which word is discussed in *Buckner v. American National Ins. Co.,* 117 Ga. App. 633 (161 SE2d 319). During the course of the trial in the case sub judice, defendant insurer elected to place upon the witness stand as its witness Dr. J. Lon King, Jr., who had performed the operation upon plaintiff, and he testified as follows: "Q. You now know, do you not, Doctor, that Mrs. Hammock had endometriosis or ademyosis? A. Ademyosis, right. . . Q. And it is your opinion, now, is it not, that this endometriosis was the cause of part of her—the basis of her upset toward the end, toward January 20, the cause of her bleeding and her pain, was it not? A. I think it probably had a lot to do with her discomfort and her excessive bleeding. Q. And when you say this pressure and this pain, that's the discomfort that you are talking about? A. Yes. Q. And you were unaware of this until January 20—until after the operation? A. Yes." None of this was "manifest" to plaintiff, nor even to her physician, prior to the operation, and hence same could not have been excluded by the previously quoted exclusionary clause in the policy. The word "manifest" is defined in Continental Casualty Co. v. Robertson, 245 F2d 604, 607, where recovery on a polio policy was upheld, although said polio was clearly contracted and in existence prior to the issuance of the policy, but the disease was not "manifest" to the insured until after issuance of the policy. The court states: "Appellant's argument is bottomed upon the contention that the policy before us would not impose liability upon the company if polio had its origin or inception on or prior to July 22nd. The company could have chosen language of such meaning, but it

did not do so. It inserted a word possessing a more exacting connotation, one contemplating the advancement of the disease beyond the point of origin and to the state where its presence was plain, distinct or beyond question or doubt. The evidence before the court below did not sustain appellant's position that, as a matter of law, polio had 'manifested itself' on or before July 22nd. Under these well settled principles, the court did not err in denying appellant's motion for directed verdict insofar as it related to appellee's expense outlay." And, as was held in *Buckner v. American National Ins. Co.*, 117 Ga. App. 633, 637, supra: "It appears that . . . the applicant . . . disclosed to the insurance company all known physical sicknesses and diseases in her 'health history.' The insurer was thereby put on notice, if it so desired, to obtain any further and more specific information."

Therefore, we reverse the trial court in granting defendant's motion for judgment notwithstanding the verdict. The evidence authorized, but did not require, a verdict for plaintiff, and as this is the first grant of motion for new trial, and is therefore within the trial judge's discretion, we affirm this first grant of a motion for new trial. *Code* § 6-1608, as amended (Ga. L. 1959, pp. 353, 354); *Dunn v. Gilbert*, 217 Ga. 358 (122 SE2d 93); *Kroger Co. v. Perpall*, 105 Ga. App. 682 (4) (125 SE2d 511).

*Judgment reversed in part; affirmed in part. Jordan, P. J., and Quillian, J., concur.*

SUBMITTED OCTOBER 6, 1971—DECIDED NOVEMBER 15, 1971.

*Adams, O'Neal & Hemingway, Hardy Gregory, Jr.*, for appellant.

*Jones, Cork, Miller & Benton, Wallace Miller, Jr.*, for appellee.